```
IN THE UNITED STATES DISTRICT COURT FOR THE
         EASTERN DISTRICT OF OKLAHOMA
```

| | | |
|---|---|---|
| AGAPE FLIGHTS, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV-09-492-FHS |
| | ) | |
| COVINGTON AIRCRAFT ENGINES,INC.; | ) | |
| PRATT & WHITNEY CANADA | ) | |
| CORPORATION; HAMILTON SUNDSTRAND | ) | |
| CORPORATION; KANSAS AVIATION OF | ) | |
| INDEPENDENCE, LLC; and JOHN DOE | ) | |
| DEFENDANTS 2-25, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PRATT & WHITNEY CANADA | ) | |
| CORPORATION and HAMILTON | ) | |
| SUNDSTRAND CORPORATION; | ) | |
| | ) | |
|     Third Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KANSAS AVIATION OF INDEPENDENCE, | ) | |
| LLC and BANYAN AIR SERVICE, INC., | ) | |
| | ) | |
|     Third Party Defendants. | ) | |

## OPINION AND ORDER

Before the Court for its consideration is the Motion To Dismiss For Lack Of Personal Jurisdiction (Dkt. No. 88) filed by Third-Party Defendant, Banyan Air Service, Inc. ("Banyan"). Banyan seeks the dismissal of the third-party claims for negligence and contribution filed against it by Defendants/Third-Party Plaintiffs, Pratt & Whitney Canada Corporation ("Pratt & Whitney") and Hamilton Sundstrand Corporation ("Sundstrand"), and the cross-claims for

1

indemnification and contribution filed against it by Defendant, Covington Aircraft Engines, Inc. ("Covington").  Pratt & Whitney, Sundstrand, and Covington filed responses in opposition Banyan's motion (Dkt. Nos. 101 and 103).  On August 12, 2010, the Court heard arguments on Banyan's motion.  At the conclusion of the hearing, the Court granted Covington leave to engage in limited jurisdictional discovery on the issue of general personal jurisdiction.[1]  Deadlines were established for the completion of the limited discovery (October 11, 2010) and for the filing of supplemental briefs by Covington (November 29, 2010) and Banyan (December 13, 2010).[2]  Having reviewed and considered all the materials submitted, the Court finds Banyan's Motion to Dismiss (Dkt. No. 88) should be granted as this Court finds there is no basis on which to exercise personal jurisdiction over Banyan.

**FACTUAL BACKGROUND**

This action arises out of the crash of a Cessna Model 208B aircraft, U.S. Registration No. N954PA (the "Aircraft"), on December 20, 2007, in the ocean waters near the Bahamas.  The Aircraft was owned and operated by Plaintiff, Agape Flights, Inc. ("Agape"), a Florida corporation with its principal place of business in Venice, Florida.  At the time of the crash, the Aircraft was being powered by a PT6A-114A engine, Serial No. PCE-17014 (the "Engine"), which Agape had rented from Covington

---

[1] Pratt & Whitney and Sundstrand were not granted permission to engage in such limited discovery as they did not assert that this Court could exercise general personal jurisdiction over Banyan. Pratt & Whitney and Sundstrand Response Brief (Dkt. No. 103, p. 7, n. 2).

[2] The original deadlines established by the Court for the filing of the supplemental briefs were extended at the request of Covington and Banyan.

pursuant to a November 7, 2007, Engine Rental Agreement. Pratt & Whitney is the manufacturer of the Aircraft's Engine and Sundstrand is the manufacturer of the Fuel Pump, Part No. 025323-150, Serial No. 839 ("Fuel Pump"), which was part of the Aircraft's Engine. In its Amended Complaint, Agape contends the crash and resultant destruction of the Aircraft was caused by the "defective and unserviceable condition of the Engine, including the fuel pump installed in the Engine." Amended Complaint (Dkt. No. 60), ¶ 13. In particular, Agape's investigation has led it to conclude that the crash occurred as a result of an in-flight power loss resulting from the Fuel Pump drive shaft splines being severely worn. Agape seeks to recover from Covington, Pratt & Whitney, Sundstrand, and Kansas Aviation of Independence, LLC ("Kansas Aviation") for the loss of the Aircraft under theories of negligence, strict products liability, breach of contract, and breach of warranties.[3] In turn, Pratt & Whitney and Sundstrand have asserted third-party claims against Kansas Aviation and Banyan for negligence and contribution. Covington has filed cross-claims against Banyan for indemnification and contribution.

Covington, an Oklahoma corporation with its principal place of business in Okmulgee, Oklahoma, operates a business of aircraft maintenance, repair, and overhaul. As part of its operations, Covington provides customers, such as Agape, with rental engines for their aircraft while the customer's primary engine is being serviced by Covington. As noted above, at the time of the crash on December 20, 2007, the Aircraft was being powered by the Engine, which was a rental engine Covington had provided to Agape pursuant to the November 7, 2007, Engine Rental Agreement. Prior to the

---

[3] Agape's claims against Kansas Aviation are limited to negligence and breach of warranties.

3

Engine being placed on the Aircraft, the Engine's Fuel Pump was serviced, at the request of Covington, by Kansas Aviation. Kansas Aviation is in the business of repairing and overhauling engine accessories, including fuel pumps. On or about February 10, 2006, Kansas Aviation overhauled the Fuel Pump for Covington at its Kansas facility and shipped the Fuel Pump back to Covington in Oklahoma.[4] Covington placed the overhauled Fuel Pump in the Engine and the Engine was maintained in Covington's rental pool.

On March 26, 2007, Covington entered into a Engine Rental Agreement with Capcana S.A./Africair, Inc. ("Capcana") for the rental of the Engine to be used and installed on Capcana's aircraft while Capcana's engine was being overhauled by Covington. At Capcana's direction, the Engine was shipped to Banyan's Fort Lauderdale, Florida, facility in order for Banyan to install the Engine on Capcana's aircraft. Banyan is an FBO, or fixed based operator, located at Fort Lauderdale Executive Airport. Banyan provides comprehensive aviation services to general aviation aircraft operators. After the installation of the Engine on Capcana's aircraft, Capcana experienced performance issues with the Engine and Capcana returned its aircraft to Banyan's Fort Lauderdale facility for service. Banyan's inspection of the Engine led to the removal of the Fuel Pump and the fuel control unit. Due to the Engine being a rental from Covington, Banyan contacted Covington via telephone in late July or early August 2007 and determined that the fuel control unit needed to be replaced. The old fuel control unit was shipped by Banyan to Covington and Covington arranged for a new fuel control unit to be shipped to Banyan through International Governor Service ("International

---

[4] On September 7, 2010, the Court entered an Opinion and Order (Dkt. No. 122) denying Kansas Aviation's Motion To Dismiss (Dkt. No. 90) for lack of personal jurisdiction.

Governor"), a Bloomfield, Colorado, company.  Banyan received the new fuel control unit on or about August 2, 2007, and Banyan thereafter installed the new fuel control unit and reinstalled the Fuel Pump on the Capcana aircraft.  After Capcana's engine was overhauled by Covington, the Engine was returned to Covington by Capcana and it was ultimately placed in Agape's Aircraft on or about November 7, 2007, pursuant to Agape's engine rental agreement with Covington.

The additional discovery conducted by Covington was an attempt to determine Banyan's business contacts and connections with Oklahoma.  Covington attempted to determine the gross revenues Banyan derived from Oklahoma customers for the period 2005 through 2009.  These revenues were generated through purchases by Oklahoma customers on Banyan's interactive website, www.banyanair.com, which contains an online store, Tropic Aero at www.tropicaero.com.  The statistical data was broken down by categories: (1) gross revenue and transactions from aircraft/avionics sales to Oklahoma based entities ("Category 1") and (2) gross revenue and transactions from aircraft/avionics sales to Oklahoma based entities, but actually shipped to a state other than the State of Oklahoma ("Category 2").[5]  For 2005, Banyan's Oklahoma activity was as follows:

---

[5] Additional data has been presented by Covington as to a third category involving gross revenue and transactions from fuel sales, aircraft maintenance and avionics maintenance all performed in Florida for customers located in Florida at the time of service, who happened to be from Oklahoma ("Category 3").  This Category 3 activity amounts to approximately $150,000 in gross revenue resulting from 140 transactions over the five-year period of 2005 to 2009.  The Court agrees with Banyan that these Category 3 contacts should not be considered in the Court's general jurisdiction analysis in that they evidence no contact directed towards Oklahoma citizens or entities which was initiated or facilitated by Banyan, but rather, they result from Oklahoma citizens or entities being physically located in Florida

Category 1 activity of $8,267.83 in gross revenue and seven (7) transactions and Category 2 activity of $69.12 in gross revenue and one (1) transaction. For 2006, Banyan's Oklahoma activity was as follows: Category 1 activity of $8,386.26 in gross revenue and nine (9) transactions and Category 2 activity of $94.50 in gross revenue and two (2) transactions. For 2007, Banyan's Oklahoma activity was as follows: Category 1 activity of $16,464.95 in gross revenue and twenty-three (23) transactions and Category 2 activity of $18,442.49 in gross revenue and thirteen (13) transactions. For 2008, Banyan's Oklahoma activity was as follows: Category 1 activity of $21,090.56 in gross revenue and nineteen (19) transactions and Category 2 activity of $7,251.45 in gross revenue and fourteen (14) transactions. For 2009, Banyan's Oklahoma activity was as follows: Category 1 activity of $11,664.15 in gross revenue and nine (9) transactions and Category 2 activity of $1,798.45 in gross revenue and six (6) transactions. Taking these figures and calculating them as a percentage of Banyan's entire gross revenue for the period of 2005 to 2009 results in a finding that .028648% of Banyan's entire gross revenue was derived from Category 1 activity - aircraft/avionics sales to Oklahoma entities in which products were actually shipped to Oklahoma. The combination of Category 1 and Category 2 activity results in a finding that .040658% of Banyan's gross revenue for the five-year period was derived from aircraft/avionics sales to Oklahoma customers where the products were shipped to locations in Oklahoma and outside Oklahoma.

Banyan's other contacts with the State of Oklahoma as developed by Covington during the course of the additional

---

and availing themselves of the services and products provided by Banyan at its Florida facility.

discovery involve two trips to Oklahoma by Paul Rose ("Rose"), Vice President of Technical Sales and Support for Banyan. In August 2005, Rose visited Spirit Wing Aviation in Guthrie, Oklahoma, to discuss a potential project to re-engine the Lear 20 series Williams FJ-44A light weight Stage III engine. No deal was ever reached on this project. Finally, in October 2005, Rose visited with John Groth ("Groth") of the United States Air Force to discuss contractor logistics support for the RC-26B avionics upgrade program. Rose met with Groth at Tinker Air Force base in Oklahoma where Groth was located from October 28-30, 2005.

## **ANALYSIS**

The issue raised by Banyan's Motion to Dismiss (Dkt. No. 88) is whether this Court has personal jurisdiction over Banyan, a nonresident third-party defendant. As the parties asserting claims against Banyan, the burden of establishing such jurisdiction rests with Covington, Pratt & Whitney, and Sundstrand. Rambo v. American Southern Ins. Co., 839 F.2d 1415, 1417 (10th Cir. 1988). At this preliminary stage of the litigation, however, this burden is not a heavy one. Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000). In order to defeat a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction supported by affidavits and other materials, the parties contesting such motion "need only make a prima facie showing of personal jurisdiction." OMI Holdings, Inc. v. Royal Ins. Co. Of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998). The Court considers the allegations of the complaint to be true to the extent they are uncontroverted by opposing affidavits. Intercon, 205 F.3d at 1247. Moreover, all factual disputes are to be resolved in favor of the parties bearing the burden of establishing personal jurisdiction. Id. If a prima facie case of personal jurisdiction is established,

7

the opposing party may defeat such showing by presenting "a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" OMI Holdings, 149 F.3d at 1091 (quoting Burger King v. Rudzewicz, 471 U.S. 472, 477 (1985)).

In a diversity action such as the instant case, the law of the forum determines the existence of personal jurisdiction. Yarbrough v. Elmer Bunder & Assocs., 669 F.2d 614, 616 (10th Cir. 1982). Under Oklahoma law a single due process analysis is utilized to determine the extent of personal jurisdiction over a nonresident defendant. Oklahoma's long-arm statute provides that "[a] court of this state may exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States." Okla. Stat. Ann. tit. 12, § 2004F. The general test for determining whether a state may exercise personal jurisdiction under the federal Constitution is well-established:

> "A federal court sitting in diversity 'may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum state.' World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). 'The defendant's contacts with the forum State must be such that maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.'"' World-Wide Volkswagen, supra, 444 U.S. at 292 (quoting International Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940))). The sufficiency of a defendant's conduct must be evaluated by examining the defendant's conduct and connections with the forum state to assess whether the defendant has 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State. Hanson v. Denckla, 357 U.S. 235, 253 (1958)."

Rambo, 839 F.2d at 1417 (quoting First City Bank, N.A. v. Air

Capitol Aircraft Sales, Inc., 820 F.2d 1127, 1130-31 (10th Cir. 1987)). The nature of a defendant's contacts must be such that the defendant could reasonably anticipate being haled into court in the forum state. World-Wide Volkswagen, 444 U.S. at 297.

Two types of personal jurisdiction are recognized - specific and general. Specific jurisdiction involves a two-step analysis. First, it must be determined whether a defendant "has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King, 471 U.S. at 472 (1985)(internal quotations omitted); Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008)(in tort cases, courts "often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state"). If sufficient minimum contacts are present, the second step requires a showing that the exercise of personal jurisdiction over a defendant comports with traditional notions of "fair play and substantial justice." Burger King, 471 U.S. at 476. General jurisdiction, on the other hand, requires continuous and systematic contacts with the forum. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984). The minimum contacts analysis for general jurisdiction is more stringent than for specific jurisdiction as the contacts do not derive from the events giving rise to the suit. See Benton v. Cameco Corp., 375 F.3d 1070, 1080 (10th Cir. 2004), cert. denied, 544 U.S. 974 (2005).

Pratt & Whitney, Sundstrand, and Covington all contend the exercise of specific personal jurisdiction over Banyan is appropriate. They argue that Banyan's removal and reinstallation of the Fuel Pump and Banyan's replacement of the fuel control unit evidence a purposeful direction of actions to the State of Oklahoma

9

given Banyan's knowledge that the Engine was leased from Covington, an Oklahoma entity, and the fact that Banyan communicated with Covington regarding its work on the Engine on behalf of Capcana. The Court disagrees.

The initial burden for establishing specific personal jurisdiction requires a showing that a nonresident defendant has purposefully directed its activities at the residents of the forum state. Burger King, 471 U.S. at 472. This "purposeful availment" element of the minimum contacts analysis "turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff . . . . [and generally] requires . . . . affirmative conduct by the defendant which allows or promotes the transaction of business within the forum state." Rambo, 839 F.2d at 1420 (quoting Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 840 (9th Cir. 1986). Here, the contacts between Banyan and Covington - phone calls regarding the performance of the fuel control unit and Covington's arrangement for the shipment of a replacement fuel control unit from International Governor in Colorado - did not promote the transaction of any business in Oklahoma. Banyan's contacts with Covington resulted from Capcana returning its aircraft to Banyan at Banyan's Florida facility. Because its customer, Capcana, was experiencing troubles with the Engine Capcana had rented from Covington, Banyan communicated with Covington in Oklahoma in order to discuss various issues of maintenance on the Engine, including the replacement of the fuel control unit. While these contacts were initiated by Banyan in Florida, they were certainly not done to promote the transaction of any business in Oklahoma. Rather, the transaction of business which was facilitated or promoted was Banyan's replacement of the fuel control unit in Florida for Capcana. Banyan did not transact any business with Covington in Oklahoma or solicit any business

from Covington.  Banyan's contacts with Covington did not result in Banyan deriving any economic benefit from the exchange with Covington.  What Banyan received was technical assistance to perform its maintenance work in Florida for Capcana.  In sum, Banyan's limited contacts with Covington merely facilitated the business Banyan was conducting in Florida - the replacement of the fuel control unit for Capcana.  Under these circumstances, the contacts between Banyan and Covington can best be described as "random, fortuitous, or attenuated contacts" insufficient to satisfy the minimum contacts requirements for the exercise of specific personal jurisdiction.[6]  Consequently, the Court determines it lacks specific personal jurisdiction over Banyan.[7]

Covington also argues it is appropriate to exercise general personal jurisdiction over Banyan.  In addition to Banyan's contacts with Covington during the course of Banyan's servicing of the Engine for Capcana, Covington relies on Banyan's history of business dealings with customers located in Oklahoma.  Covington contends that as a result of these business dealings Banyan has sold products to Oklahoma customers, billed Oklahoma customers for products sold and services provided, and shipped products to Oklahoma customers.  These business dealings involve sales to Oklahoma customers over Banyan's internet sites and two business-

---

[6] The attenuated nature of the contacts is further evidenced by the fact that when the fuel control unit was replaced by Banyan, the Engine was on lease to Capcana, a non-party to this action, and not to Agape.

[7] Given the absence of minimum contacts, there is no need to address the additional specific personal jurisdiction requirement that the exercise of personal jurisdiction over Banyan would comport with traditional notions of "fair play and substantial justice."  Burger King, 471 U.S. at 476.

related visits to Oklahoma by Banyan's employee, Rose.[8] Combining the Category 1 and Category 2 sales, the internet sales from 2005 to 2009 total nearly $94,000.00 in gross revenue from 103 separate transactions involving Oklahoma-based customers. These sales amount to only .040658% of the Banyan's total gross revenue for that five-year time period.

In order to assert general personal jurisdiction over Banyan, Covington must establish that Banyan has "continuous and systematic" contacts with Oklahoma. Helicopteros, 466 U.S. at 415. The Tenth Circuit has relied on certain factors to assist in the determination of whether the general business contacts of a non-resident corporate defendant are sufficient to exercise general personal jurisdiction: whether the defendant is (1) engaged in business in the forum; (2) licensed to do business in the forum; (3) owning, leasing, or controlling property (real or personal) or assets in the forum; (4) maintaining employees, offices, agents, or bank accounts in the forum; (5) present in that shareholders reside in the forum; (6) maintaining phone or fax listings within the forum; (7) advertising or soliciting business in the forum; (8) traveling to the forum by way of salespersons or other employees; (9) paying taxes in the forum; (10) visiting potential customers in the forum; (11) recruiting employees in the forum; and (12) generating a substantial percentage of its national sales through revenue generated from customers of the forum. Soma Medical International v. Standard Chartered Bank, 196 F.3d 1292, 1295 (10th Cir. 1999).

---

[8] Covington also attempts to rely on Banyan's fuel sales to Oklahoma customers while those customers were in Florida. As noted above, the Court finds these contacts do not enter the general personal jurisdiction analysis as they were not directed at this forum. Supra. n. 5.

12

Covington's submission of the internet sales data and the visits to Oklahoma by Rose implicates only factors 1, 8, 10, and 12. Covington has not presented any evidence to either implicate the other factors or to rebut the affidavit of Donald A. Campion ("Campion"), President of Banyan, related to Banyan's non-presence in Oklahoma. In his affidavit, Campion asserts Banyan (a) is not, and has never been, registered to do business in Oklahoma; (b) has never had a registered service agent in Oklahoma; (c) has never had an Oklahoma mailing address or telephone listings; (d) has never employed any Oklahoma resident; (e) has never been registered with the Oklahoma Tax Commission; (f) has never maintained an office in Oklahoma; (g) has never paid any taxes to the State of Oklahoma; (h) has never owned or leased real or personal property in Oklahoma; (i) has never before been sued in Oklahoma; (j) has never maintained any company files or records in Oklahoma; and (k) has never held any bank accounts in Oklahoma. Thus, it is evident from Campion's affidavit that Banyan does not have a true, traditional business presence in the State of Oklahoma.

Covington's case for general personal jurisdiction rests primarily on Banyan's internet sites to establish website sales and a significant business presence on the part of Banyan in Oklahoma. This evidence touches on factors 1 and 12 of the Soma analysis (whether Banyan engaged in business in Oklahoma and the percentage of its national sales generated from Oklahoma customers). In this internet age, the existence of an interactive website which allows for the exchange of information and for sales transactions over a virtually unlimited geographical area cannot, by itself, equate with the existence of general personal jurisdiction. Courts have recognized that the "continuous and systematic" requirement for general personal jurisdiction necessitates more than the existence of an interactive website before a nonresident defendant can be

13

subjected to suit in a forum. As aptly noted by the Court in Dagesse v. Plant Hotel, N.V., 113 F.Supp.2d 211 (D.N.H. 2000):

> [t]he consensus among courts that have focused explicitly on the issue is that general jurisdiction cannot be founded solely on the existence of a defendant's internet website. As many courts have recognized, to hold that the mere existence of an internet website establishes general jurisdiction would render any individual or entity that created such a web site subject to personal jurisdiction in every state. Such a rule "would eviscerate the personal jurisdiction requirement as it currently exists . . . ."

Id. at 221 (quoting Millennium Enterprises v. Millenium Music, 33 F.Supp.2d 907, 910 (D.Or. 1999)(internal citations omitted). What must be evaluated in the context of an interactive website is "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1124 (W.D. Pa. 1997). As noted by the Court in Zippo, this evaluation "reveals that the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." Id.[9]

---

[9] Zippo established a sliding scale approach when evaluating websites. The classifications were (1) websites where "a defendant clearly does business over the Internet," (2) passive websites "where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions," and (3) interactive websites "where a user can exchange information with the host computer." Id. at 1124. The first category results in the proper exercise of personal jurisdiction, the second category clearly does not, and the third category, or middle ground, requires an evaluation of the exchange of information occurring on the website. Id. Although Zippo was a specific jurisdiction analysis case, the Tenth Circuit referenced this framework in Soma when it determined that the website at issue was merely a passive informational site which did not subject the defendant to general personal

Consistent with this observation, and in attempt to adhere to the "continuous and systematic" requirement for general personal jurisdiction, the United States District Court for the Northern District of Oklahoma has adopted a standard for evaluating websites. In <u>Smith v. Basin Park Hotel, Inc.</u>, 178 F.Supp.2d 1225 (N.D. Okla. 2001), the Court held:

> [a] web site will subject a defendant to general personal jurisdiction only when the defendant has actually and deliberately used its website to conduct commercial transactions on a sustained basis with a substantial number of residents of the forum.

<u>Id.</u> at 1235. The evidence submitted by Covington in relation to Banyan's website activity simply does not satisfy this standard. Banyan's internet sales to Oklahoma customers via its two websites amount to only .040658% of the Banyan's total gross revenue for the five-year period of 2005-2009. <u>See</u> <u>Hydro Engineering v. Landa, Inc.</u>, 231 F.Supp.2d 1130, 1133-34 (D. Utah 2002)(in finding that the <u>Soma</u> factors did not weigh in favor of exercising general personal jurisdiction, the district court held that a nonresident corporate defendant's sales through a Utah distributor and directly to Utah consumers amounting to 1.85% of defendant's national sales did not constitute a substantial percentage of defendant's national sales). There is also no evidence in the record that Banyan has targeted Oklahoma customers in connection with its products and services offered on its websites. Thus, it is abundantly clear that Covington has failed to establish that Banyan has "actually and deliberately used its website[s] to conduct commercial transactions on a sustained basis with a substantial number of residents" of Oklahoma. <u>Smith</u>, 178 F.Supp.2d at 1235.

---

jurisdiction.

Finally, Covington's reliance on Rose's two visits to Oklahoma in 2005 (implicating Soma factors 8 and 10) are so isolated and random that they do not lend any support for a finding of "continuous and systematic" contacts by Banyan with Oklahoma. Outside of these two visits over a five-year period, Covington offers nothing to establish that Banyan routinely visits Oklahoma to solicit customers or otherwise avails itself of the benefits of this forum to further its business activities.

In sum, an analysis of the Soma factors points undeniably in one direction - that Banyan does not have the necessary "continuous and systematic" business contacts with Oklahoma to justify the Court's exercise of general personal jurisdiction over it for the claims asserted by Covington.

## CONCLUSION

Based on the foregoing reasons, the Court finds no basis upon which to exercise personal jurisdiction over Banyan with respect to the claims asserted by Pratt & Whitney, Sundstrand, and Covington. Banyan's Motion To Dismiss For Lack Of Personal Jurisdiction (Dkt. No. 88) is therefore granted.

It is so ordered this 12th day of January, 2011.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma