IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

AGAPE FLIGHTS, INC.,            )
                                )
        Plaintiff,              )
                                )
v.                              )   No. CIV-09-492-FHS
                                )
COVINGTON AIRCRAFT ENGINES,INC.;)
KANSAS AVIATION OF INDEPENDENCE,)
LLC; and JOHN DOE DEFENDANTS    )
2-25,                           )
                                )
        Defendants.             )

**<u>OPINION AND ORDER</u>**

This matter comes before the Court on the Motion for Summary Judgment (Dkt. No. 248) filed by Covington Aircraft Engines, Inc. ("Covington"). In its motion, Covington contends it is entitled to summary judgment on the claims asserted by Plaintiff, Agape Flights, Inc. ("Agape"), for strict products liability, negligence, breach of contract, and breach of warranty arising out of a December 20, 2007, crash of Agape's aircraft. Covington asserts the following arguments: (1) Agape's claims for strict products liability and negligence are barred by the economic loss doctrine; (2) Agape's strict products liability claim fails because the record establishes that the subject engine was not defective; (3) Agape's negligence claim fails as a matter of law because Covington complied with all regulations and service requirements promulgated pursuant to the Federal Aviation Act of 1958 ("FAA") through the Administrator of the Federal Aviation Administration; and (4) Agape's breach of contract/warranty claims fail because Covington complied with the express warranty in the parties' contract and, further, that such contract excludes all implied warranties. The

1

parties have fully briefed the issues and this matter is ripe for ruling. Having fully considered all matters submitted by the parties, the Court finds that Covington's Motion for Summary Judgment (Dkt. No. 248)("Covington's Motion") should be granted for the reasons set forth below.

**SUMMARY JUDGMENT STANDARD**

The standards relevant to the disposition of a case on summary judgment are well established. Having moved for summary judgment in its favor under Rule 56 of the Federal Rules of Civil Procedure, Covington's initial burden is to show the absence of evidence to support Agape's claims. Celotex v. Catrett, 477 U.S. 317, 325 (1986). Covington must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact. Universal Money Centers v. AT&T, 22 F.3d 1527, 1529 (10th Cir.), cert. denied, 115 S.Ct. 655 (1994) (quoting Fed. R. Civ. P. 56(c)). Covington need not negate Agape's claims or disprove Agape's evidence, but rather, its burden is to show that there is no evidence in the record to support Agape's claims. Celotex, 477 U.S. at 325. Agape, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [it] carries the burden of proof." Applied Genetics v. First Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990).

Summary judgment is not appropriate if there exists a genuine material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51 (1986). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute

2

about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Thomas v. IBM, 48 F.3d 478, 486 (10th Cir. 1995) (quoting Anderson, 477 U.S. at 248). In this regard, the court examines the factual record and reasonable inferences therefrom in the light most favorable to Agape. Deepwater Invs. Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). This Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**FACTUAL BACKGROUND**

On November 20, 2007, a Cessna Grand Caravan Model 208B aircraft, serial number 208B0556, U.S. Registration No. N954PA (the "Aircraft") crashed into the ocean waters near the Bahamas. As a result of the crash, the Aircraft was destroyed. The Aircraft was owned and operated by Agape and it was being powered by a PT6A-114A engine, Serial No. PCE-17014 (the "Engine"), which Agape had rented from Covington pursuant to a November 7, 2007, Engine Rental Agreement ("Rental Agreement"). Pratt & Whitney Canada Corporation ("P&WC") is the manufacturer of the Aircraft's Engine and Hamilton Sundstrand Corporation ("Sundstrand") is the manufacturer of the Fuel Pump, Part No. 025323-150, Serial No. 839 ("Fuel Pump"), which was part of the Aircraft's Engine. In its Amended Complaint, Agape contends the crash and resultant destruction of the Aircraft were caused by the "defective and unserviceable condition of the Engine, including the fuel pump installed in the Engine." Amended Complaint (Dkt. No. 60), ¶ 13. In particular, Agape's investigation has led it to conclude that the crash occurred as a result of an in-flight power loss resulting from the Fuel Pump drive shaft splines being severely worn. Agape seeks to recover

from Covington for the loss of the Aircraft under theories of strict products liability, negligence, breach of contract, and breach of warranty. Agape seeks to recover only economic damages resulting from the loss of the Aircraft. Agape does not present any claims for personal injury or damage to property other than the Aircraft itself.

Agape also brought this action against P&WC, Sundstrand, and Kansas Aviation of Independence, LLC ("Kansas Aviation"). On June 28, 2011, the Court granted the motions to dismiss filed on behalf of P&WC and Sundstrand on the basis that the 18-year statute of repose under the General Aviation Revitalization Act of 1994 ("GARA") barred all claims asserted by Agape against P&WC and Sundstrand. As to Kansas Aviation, Agape alleges Kansas Aviation overhauled the Fuel Pump on or about February 10, 2006, and that the Fuel Pump was placed on the Engine and maintained in Covington's rental pool until the Engine, with the refurbished Fuel Pump, was placed in the Aircraft for Agape's use pursuant to the Rental Agreement between Agape and Covington. Agape's claims against Kansas Aviation are limited to negligence and breach of warranties. On September 27, 2011, the Court entered an order granting Kansas Aviation's motion to dismiss Agape's negligence claim as barred by the applicable statute of limitations.[1] Agape's breach of warranty claim against Kansas Aviation remains pending.

As noted, the Fuel Pump was overhauled by Kansas Aviation and approved for return to service on February 10, 2006. No

---

[1] After hearing argument on Agape's request for reconsideration of the dismissal of the negligence claim against Kansas Aviation, the Court authorized Agape to file a Motion to Revise within twenty (20) days of the close of discovery. Thus, the Court's dismissal of Agape's negligence claim against Kansas Aviation is potentially subject to reconsideration.

4

abnormalities or excessive wear were noted by Kansas Aviation with respect to its overhaul of the Fuel Pump. The Fuel Pump was later sold to Covington and was installed on the Engine by Covington during its overhaul of the Engine. Covington approved the Engine for return to service on September 6, 2006. Between September 6, 2006, and November 3, 2007, the Engine and Fuel Pump were installed on multiple aircraft - all in accordance with FAA regulations. One such aircraft involved an Engine Rental Agreement with Capcana S.A./Africair, Inc. ("Capcana"). On March 26, 2007, Capcana rented the Engine from Covington. Capcana installed the Engine on its aircraft while its engine was being overhauled by Covington. At Capcana's direction, the Engine was installed on its aircraft by Banyan Air Service, Inc. ("Banyan"). While the Engine was in Capcana's possession, Banyan performed the FAA required 100 hour inspection of the Engine and certified the Engine as airworthy on May 6, 2007.[2]

The Engine was returned by Capcana to Covington and it was ultimately placed in Agape's Aircraft by Covington on or about November 7, 2007, pursuant to the Rental Agreement. At the time of installation, the Fuel Pump had accumulated approximately 504 hours of time in service since overhaul. At the 504 hours of service mark, there is no inspection, disassembly, or maintenance required by applicable FAA regulations. The P&WC Engine maintenance manual mandates a 600-hour in-situ safety inspection to determine unusual

---

[2] As noted in the Court's Opinion and Order (Dkt. No. 187) granting Banyan's motion to dismiss the third-party claims of P&WC and Sundstrand and the cross-claims of Covington for lack of personal jurisdiction, Banyan removed the Fuel Pump and fuel control unit in late July or early August 2007 after Capcana experienced performance issues with the Engine. Banyan installed a new fuel control unit on or about August 2, 2007, and reinstalled the Fuel Pump on the Capcana aircraft.

wear at the fuel pump drive shaft and drive coupling splines.[3] At the time Covington installed the Engine on Agape's Aircraft, the Engine and Fuel Pump had been overhauled, inspected, and certified in compliance with all applicable FAA regulations. Covington conducted a run-up of the Engine prior to placing it on any aircraft, including Agape's Aircraft. After receiving the Engine from Covington, Agape performed the 600-hour in-situ inspection as set forth in the P&WC maintenance manual. No unusual wear was noted by Agape. This inspection by Agape took place after Agape had operated the Aircraft for approximately five weeks and 93 hours of service since taking delivery from Covington. After approximately 33 more hours of service time, the Aircraft was involved in the December 20, 2007, crash.

The Rental Agreement between Covington and Agape includes an express warranty by Covington "that at the time of delivery the rental engine will be in flight-worthy condition and conform to applicable P&WC specifications."[4] The Rental Agreement further excludes all other warranties by providing that "[t]his warranty is given in place of all other warranties, express or implied,

---

[3] The PW&C manual also provides that at 1800-hour intervals, maintenance personnel must "remove the pump and inspect the drive coupling and cover for signs of reddish-brown (iron oxide) stains." Expert Report by Engineering Systems, Inc. ("ESI Report"), Exhibit No. 1, p. 9 to Covington's Motion.

[4] Additional warranty language provides "P&WC shall be responsible for repair or replacement of the engine in case of damage resulting from normal operation in accordance with applicable manuals and operating instructions, and without fault or negligence on the Customer's part." In its Opinion and Order (Dkt. No. 208) granting the motions for summary judgment of P&WC and Sundstrand, the Court found that this warranty language suggesting some obligation on the part of P&WC does not bind P&WC as it was included in error and without P&WC's approval or assent.

including without limitation any warranties as to the merchantability or fitness for purpose of the rental engine."

**ECONOMIC LOSS DOCTRINE**

Covington argues that Agape's claims for strict products liability and negligence are barred by the economic loss doctrine. This doctrine, as adopted by Oklahoma Supreme Court in <u>Waggoner v. Town & Country Mobile Homes, Inc.</u>, 808 P.2d 649, 653 (Okla. 1990), bars recovery under tort theories for "injury only to the product itself resulting in purely economic loss." <u>See</u> <u>also</u> <u>Oklahoma Gas & Electric Company v. McGraw-Edison Company</u>, 834 P.2d 980 (Okla. 1992)(relying on <u>Waggoner</u> and concluding that a plaintiff in a products liability action may not recover damages for injury to a defective product itself and consequential economic harm flowing from that injury). Damages to the product itself are recoverable under contract law in actions brought under the Uniform Commercial Code. <u>Waggoner</u>, 808 P.2d at 652. The Oklahoma Supreme Court has also recognized, however, that damages to "other property" apart from the product itself are recoverable in tort actions. <u>Id</u>.; <u>see also</u> <u>Oklahoma Gas & Electric</u>, 834 P.2d at 982 (claims for personal injury or damage to other property would not fall within ambit of economic loss doctrine).

Here, Covington contends Agape's tort claims are barred because it is seeking to recover purely economic losses associated with the loss of the Aircraft. Covington argues the Aircraft is the "product" for purposes of application of the economic loss doctrine because the Aircraft, Engine, and Fuel Pump are one "integrated unit." The Court rejects this argument. While the Oklahoma Supreme Court has not addressed the "integrated unit" argument in the context of the economic loss doctrine, this Court

7

concludes that any analysis in this area requires a focus on the object of the parties' bargain or contract. See American Eagle Ins. Co. v. United Technologies Corp., 48 F.3d 142, 144-45 (5th Cir. 1995)(recognizing that the controlling inquiry in an "other property" evaluation of the economic loss doctrine is "whether the parties bargained separately for individual components of the vessel" and if they did, then recovery in strict products liability would be allowed where individually defective components cause damage to the whole of the vessel); Mays Towing Co., Inc. v. Universal Mach Co., Inc., 755 F.Supp 830, 833 (S.D. Ill. 1990)(damage to boat was considered "other property" where the parties had bargained for the sale of engines and not the construction of the boat). A focus on the object of the parties' bargain properly limits the scope of the economic loss doctrine. Under the Rental Agreement, Covington and Agape entered into a lease of the Engine and its component parts. No contractual arrangement exists between Covington and Agape regarding the Aircraft. Consequently, for purposes of application of the economic loss doctrine, the Engine and its component part Fuel Pump are the "product" and the Aircraft is considered "other property." The economic loss doctrine, therefore, bars recovery for damages to the Engine and its component part Fuel Pump only. Agape is entitled to proceed under its tort theories of recovery for damages to the Aircraft itself as "other property."[5]

---

[5] Covington's reliance on Sea-Land Service, Inc. v. Gen. Elec. Co., 134 F.3d 149 (3rd Cir. 1998), Argotors, Inc. v. Bell Helicopter Textron, Inc., 2004 WL 2039954 (E.D. Pa. 2004), and Americoach Tours, Inc. v. Detroit Diesel Corp., 2005 WL 2335369 (W.D. Tenn. 2005) does not assist it in its argument that essential component parts of an integrated unit are considered one product. In all three cases the plaintiffs contracted for a completed product, including component parts which were allegedly defective. Here, the completed product - the Aircraft - was not bargained for by Agape. Rather, the Rental Agreement involves

8

**PRODUCTS LIABILITY CLAIM BARRED DUE TO LACK OF DEFECT**

In order to prove its strict products liability claim under Oklahoma law, Agape must show (1) the product caused Agape's injury; (2) a defect in the product existed at the time if left Covington's possession and control; and (3) the defect rendered the product unreasonably dangerous. <u>Kirkland v. General Motors Corp.</u>, 521 P.2d 1353, 1363 (Okla. 1974). Covington contends that Agape's strict products liability claim fails as a matter of law because the undisputed evidence establishes that the Engine and Fuel Pump were not defective at the time Covington installed them on Agape's Aircraft. Covington's argument is two-fold. First, Covington contends that this Court's previous Opinion and Order (Dkt. No. 208) granting summary judgment in favor of P&WC and Sundstrand operates to preclude a strict products liability claim against it as a distributor of the Engine and Fuel Pump. In its previous Opinion and Order, this Court determined that the 18-year statute of repose under the General Aviation Revitalization Act of 1994 ("GARA") barred all claims asserted by Agape against P&WC and Sundstrand, the manufacturers of the Engine and Fuel Pump, respectively. Covington contends it would be contrary to the underlying rationale of GARA to allow a strict products liability claim to proceed against a distributor, who is sued solely on the basis of its position in the chain of distribution, when the same claim has been dismissed against the manufacturer under the statute of repose. This Court agrees.

GARA was enacted to address problems affecting the general aviation industry, in particular, "the enormous product liability costs that our tort system had imposed upon manufacturers of

---

the Engine only.

9

general aviation aircraft." Lyon v. Augusta S.P.A., 252 F.3d 1078, 1084 (9th Cir. 2001). GARA's 18-year statute of repose is "a legal recognition that, after an extended period of time, a product has demonstrated its safety and quality, and that it is not reasonable to hold a manufacturer legally responsible for an accident or injury occurring after that much time has elapsed." Altselmer v. Bell Helicopter Textron, Inc., 919 F.Supp. 340, 342 (E.D. Cal. 1996)(quoting 140 Cong. Rec. H4998 (daily ed. July 27, 1994)(statement of Rep. Fish)). Implicit within the rationale behind GARA's 18-year statute of repose is the inability to establish the defective condition of a product for purposes of successfully prosecuting a strict products liability claim. Although neither the Tenth Circuit nor any Oklahoma court has addressed the issue of whether GARA's statute of repose bars a strict product liability claim against a distributor of a product - in light of a finding that the statute of repose bars the same claim against the manufacturer of the product - Oklahoma case law does suggest the application of GARA's statue of repose to bar Agape's claim against Covington. In Braden v. Hendricks, 695 P.2d 1343, 1350 (Okla. 1985), the Oklahoma Supreme Court recognized that in a strict products liability action, "[t]he liability of the manufacturer and distributor is co-extensive, even though the distributor was not responsible for the presence of the defect." Here, Agape's claim against Covington is based solely on its position in the chain of distribution with respect to the Engine and Fuel Pump. No allegation is made that Covington is responsible for the defect by virtue of something that occurred during the distribution process. Thus, while Covington's liability is co-extensive with P&WC and Sundstrand, as the manufacturers of the Engine and Fuel Pump, respectively, it is also dependent upon a showing of liability against such manufacturers. In Braden, the Oklahoma Supreme Court held that under such circumstances a

distributor's liability is vicarious, i.e., imposed by law when one person is made answerable for the actionable conduct of another. Id. at 1351 ("Where, as here, a defect is said to be attributable solely to the manufacturing process rather than to some conduct in the distribution system, a distributor's liability may be termed vicarious."). Consequently, this Court's finding that neither P&WC nor Sundstrand are liable to Agape in strict products liability necessarily operates, as a matter of law, to exonerate Covington from any liability to Agape on such claim. Id. at 1352.

Covington also argues that the undisputed facts establish that the Engine and Fuel Pump were not defective. In support, Covington points to the testimony of Agape's experts, William Baumheuter, II ("Baumheuter") and Clifford C. Bigelow ("Bigelow"), who did not offer any opinions about either the Engine or Fuel Pump being defective.[6] See Baumheuter Deposition, Exhibit 3 to Covington's Motion, p. 172, lines 15-25 and p. 173, lines 1-12 and Bigelow Deposition, Exhibit 6 to Covington's Motion, p. 161, lines 20-25 and p. 162, lines 1-4. In response, Agape points to the testimony of both Baumheuter and Bigelow that the wear progression on the spline drives is indicative of "wear that was quite long," Bigelow Deposition, Exhibit E to Agape's Response to Covington's Motion, p. 131, line 22, and that the "shaft was deficient in some way at the time of its overhaul [by Kansas Aviation]," Baumheuter Deposition, Exhibit B to Agape's Response to Covington's Motion, p. 34, lines 14-15. When questioned further, however, both Baumheuter and

---

[6] As reflected in the ESI Report, Bigelow is a Senior Consultant for Engineering Systems, Inc. Baumheuter's position or title is neither reflected in his report (Exhibit 2 to Covington's Motion) nor in the portions of the deposition transcripts provided by the parties. The record is also silent as to the qualifications and backgrounds of both Bigelow and Baumeuter.

11

Bigelow failed to attribute the alleged cause of the crash - the excessive wear of the Fuel Pump drive shaft splines - to any defect in the Fuel Pump. Rather, Baumheuter stated that "the damage that I saw on that shaft is the result of what damage would have been initiated at the time of overhaul." Baumheuter Deposition, Exhibit 3 to Covington's Motion, p. 49, lines 2-4. Baumeuter listed misalignment of the female and male coupling, abuse, and not following the correct procedure for reassembly as possible causes of the damage. Id. at p. 49, lines 13-25. The testimony of Baumeuter and Bigelow also indicates that the materials used in the manufacture of the Fuel Pump were not defective. Id. at p. 80, lines 4-7 and Bigelow Deposition, Exhibit 6 to Covington's Motion, p. 151, lines 10-21. Thus, the evidence presented by Agape suggests shortcomings in the overhaul procedures by Kansas Aviation as the cause of the crash, not any defect in the Fuel Pump itself. Absent any evidence establishing a defect in the Fuel Pump, this Court finds Covington is also entitled to summary judgment on Agape's strict products liability claim.

**NEGLIGENCE CLAIM BAR**

Covington contends the applicable standard of care in a case involving aviation safety is not established by reference to state law. Rather, with respect to Agape's negligence claim, Covington contends such claim is evaluated by reference to the applicable federal regulations promulgated pursuant to the FAA regarding maintenance of the Aircraft. In response, Agape argues that while federal law may establish the requisite standard of care, a fact question for the jury's consideration still exists as to whether that standard of care has been met.

The Tenth Circuit Court of Appeals has undertaken a field

preemption analysis in determining whether "Congress intended to occupy the field of aviation safety to the exclusion of the states."  US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1325 (10th Cir. 2010).  In O'Donnell, the Tenth Circuit held that "[b]ased on the FAA's purpose to centralize aviation safety regulation and the comprehensive regulatory scheme promulgated pursuant to the FAA, we conclude that federal regulation occupies the field of aviation safety to the exclusion of state regulations.  The FAA was enacted to create a uniform and exclusive system of federal regulation in the field of air safety."  Id. at 1326 (citation omitted).  Under the FAA, the Administrator of the Federal Aviation Administration has been directed to promulgate regulations for the "safe flight of civil aircraft in air commerce."  49 U.S.C. § 44701(a).  Pursuant to this authority, regulations regarding maintenance and preventive maintenance of aircraft have been issued.  Under 14 C.F.R. § 43.13(a), service providers such as Covington are required to perform maintenance and preventive maintenance according to "methods, techniques, and practices prescribed in the current manufacturer's maintenance manual."

It is undisputed that P&WC's maintenance manual mandates an in-situ inspection of the Fuel Pump at 600-hour intervals.  The in-situ inspection at the 600-hour interval is required to detect the presence of any reddish-brown iron oxide deposits which would be indicative of "fretting wear between the mating splines of the fuel pump drive shaft and drive coupling."  ESI Report, p. 9.  At the time Covington received the Fuel Pump from Banyan in November of 2007, the Fuel Pump had accumulated 504 hours since overhaul.  Because the 600-hour interval had not been reached, no in-situ inspection, or any other more detailed inspection, was required of Covington under the P&WC manual.  Covington thereafter installed the Engine and Fuel Pump on the Aircraft and Agape conducted the

600-hour inspection of the Fuel Pump after it had been in its possession for 93 hours. Covington's actions in this regard satisfy the applicable standard of care set forth under the FAA regulations. Agape is attempting to impose on Covington an inspection requirement not mandated by the P&WC manual and, consequently, one not mandated under the FAA. Agape's expert testified as much in his deposition:

> Q. You've already agreed with me that there was no inspection required of Covington of the fuel pump when they received that engine back from Banyan, correct?
> A. I agree there was no FAA requirement.
>
> Q. This is an inspection that you would require that the FAA doesn't require, correct?
> A. That's correct.

Baumheuter Deposition, Exhibit 3 to Covington's Motion, p. 147, lines 5-9 and p. 155, lines 7-9. Based on Covington's compliance with all FAA inspection requirements for the Fuel Pump, this Court concludes the evidence establishes that Covington has satisfied the applicable standard of care and is entitled to judgment as a matter of law on Agape's negligence claim.

**BREACH OF CONTRACT/BREACH OF WARRANTY**

Covington contends Agape's breach of contract/breach of warranty claims must fail as a matter of law because the Rental Agreement unambiguously excludes all implied warranties and the undisputed evidence establishes that Covington complied with the Rental Agreement's limited express warranty. The warranty provision of the Rental Agreement provides, in its entirety:

> [Covington] warrants that at the time of delivery the

> rental engine will be in flight-worthy condition and conform to applicable P&WC specifications. P&WC shall be responsible for repair or replacement of the engine in case of damage resulting from normal operations in accordance with applicable manuals and operating instructions, and without fault or negligence on the Customer's part.
>
> THIS WARRANTY IS GIVEN IN PLACE OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTIES AS TO THE MERCHANTABILITY OR FITNESS FOR PURPOSE OF THE RENTAL ENGINE. IN NO EVENT SHALL [COVINGTON] OR P&WC BE LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES.

Rental Agreement, ¶8 of Exhibit 7 to Covington's Motion (caps in original). In response to these arguments, Agape contends the Rental Agreement should be rescinded due to Covington's unilateral mistake in seeming to obligate P&WC under the warranty provision. If the Rental Agreement is rescinded, Agape contends the warranties of fitness for a particular purpose and merchantability can be imposed on Covington. Agape also argues that if the Rental Agreement is not rescinded, it is entitled to the benefit of the full warranty language, including the P&WC warranty provision, and that the evidence establishes that the Engine was not flight-worthy at the time of delivery.

In its response brief to this motion for summary judgment, Agape has for the first time claimed that the Rental Agreement should be rescinded for Covington's unilateral mistake of including language which appears to make P&WC responsible for repair or replacement of the Engine. As noted above, the Court has held that this provision was included in error and without P&WC's approval or assent. This drafting error on the part of Covington, however, is not necessarily transformed into an obligation imposed on Covington. The obligations imposed on Covington under the terms of the Rental Agreement are limited to the express language

15

referencing Covington's responsibilities and obligations, i.e., the limited express warranty to provide an engine that is flight-worthy and in conformity with applicable P&WC specifications. Moreover, in making this rescission argument for the first time in its response brief, Agape has not demonstrated an entitlement to invoke this doctrine. Agape has not acted promptly in attempting to rescind. Under Oklahoma law, specifically 15 O.S. § 255, a party seeking rescission is required to "rescind promptly." The Tenth Circuit has stated that "[t]he prompt action requirement is to be strictly enforced." Federal Deposit Ins. Corp. v. Palmero, 815 F.2d 1329, 1339 (10th Cir. 1987); see also United States v. Pyle, 248 F.Supp. 40, 42 (E.D. Okla. 1965)("When a party rescinds a contract, the pleadings must affirmatively allege prompt rescission and restoration or an offer of restoration."). Agape did not plead rescission in its Complaint nor did it raise the issue immediately following this Court's June 28, 2011, Opinion and Order (Dkt. No. 208) finding that the P&WC warranty language was included in error. Agape waited nearly nine months after the Court's ruling to raise rescission for the first time. Clearly, Agape has not acted promptly in asserting rescission. See Harmon v. Phillips Petroleum Co., 196 Okla. 607, 167 P.2d 360, 364-65 (Okla. 1946)(five-month delay bars rescission claim) and Creach v. Home Owners' Loan Corp., 191 Okla. 484, 131 P.2d 108, 110 (Okla. 1942)(sixteen-month delay bars rescission claim). Consequently, the Court rejects Agape's attempt to rescind the Rental Agreement and impose additional warranty provisions on Covington.

With respect to the existing limited warranty provision that the Engine would be flight-worthy, the record is undisputed that Covington complied with its obligations. Prior the Engine being placed in Agape's Aircraft pursuant to the November 7, 2007, Rental Agreement, the Engine had been certified as airworthy by Banyan on

May 6, 2007. At the time of this installation by Covington, the Fuel Pump had 504 hours of service and it had been overhauled, inspected, and certified in compliance with all applicable FAA regulations. In addition, Covington conducted run-ups of the Engine before placing it on Agape's Aircraft. Agape's expert, Baumheuter, testified these run-ups were "reasonable and prudent" and that he didn't "doubt that it ran normally." Baumheuter Deposition, Exhibit 3 to Covington's Motion, at p. 177, lines 14-19. Moreover, Agape itself conducted an inspection some five weeks and 93 hours of service after taking delivery from Covington and Agape certified the Engine as airworthy at the conclusion of its inspection. Id. at p. 164, lines 6-25, p. 165, lines 1-4, p. 189, lines 18-25; Bigelow Deposition, Exhibit 6 to Covington's Motion, p. 98, lines 10-16.[7] Agape's certification of the Engine as airworthy took place just 33 hours of service prior to the crash. These undisputed facts establish that the Engine was not only certified as airworthy at the time of delivery to Agape on November 7, 2007, but it was also certified by Agape as airworthy 93 service hours after Covington's delivery pursuant to the Rental Agreement. Consequently, the Court finds Covington has complied with the terms of the Rental Agreement's limited express warranty by delivering the Engine to Agape in a flight-worthy condition and in conformity with applicable P&WC specifications. The record before the Court does not suggest otherwise and Covington is entitled to summary judgment as a matter of law on Agape's breach of warranty claim.

---

[7] Given the testimony of Agape's experts regarding the validity of the previous certifications of the Engine and the fact that Agape's inspection certified the Engine as airworthy, no factual issue regarding airworthiness is generated from the same experts' testimony that the wear damage on the spline drives was not normal wear progression. Baumheuter Deposition, Exhibit B to Agape's Response to Covington's Motion, p. 34, lines 4-15 and Bigelow Deposition, Exhibit E to Agape's Response to Covington's Motion, p. 131, lines 1-24.

**CONCLUSION**

Based on the foregoing reasons, Covington's Motion for Summary Judgment (Dkt. No. 248) is granted and Covington is, in all respects, dismissed from this action.

It is so ordered this 9th day of July, 2012.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma